UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

UNITED STATES OF AMERICA )
)
v. ) No. 2:11-cr-149-GZS
)
SEAMUS MAGUIRE, )
)
    *Defendant* )

*RECOMMENDED DECISION ON MOTION TO SUPPRESS*

Seamus Maguire, indicted on one charge of knowingly and intentionally distributing a mixture or substance containing marijuana, in violation of 21 U.S.C. § 841(a)(1), and one count of knowingly and intentionally possessing with intent to distribute a mixture or substance containing marijuana, in violation of 21 U.S.C. § 841(a)(1), *see* Indictment (Docket No. 3), seeks to suppress all evidence seized as a result of an investigatory stop of his vehicle by law enforcement officials on June 16, 2011, as well as statements made during custodial interrogation following his alleged demand for counsel. *See* Motion To Suppress: Investigatory Stop, Statements ("Motion") (Docket No. 27) at 1.

An evidentiary hearing was held before me on January 12, 2012, at which the defendant appeared with counsel. The government tendered four witnesses and offered three exhibits, all of which were admitted without objection. The defendant called one witness, himself. After both sides rested, counsel for each argued orally. I now recommend that the following findings of fact be adopted and that the Motion be denied.

**I. Proposed Findings of Fact**

Maine Drug Enforcement Agency ("MDEA") agent Jason Pease, with the help of other law enforcement agents, set up surveillance in mid-coast Maine on June 16, 2011, on the basis of

a tip from a confidential informant ("CI") that two individuals named Nathan Taylor and Chris Luce were going to transact a drug deal that day.

This was not the first time that Pease had dealt with the CI. He had been working with the CI off and on for five or six years, and the CI had supplied drug trafficking information that had been corroborated and had led to drug seizures and drug-related arrests. Nor was this the first time that Pease had received information that Luce was involved in drug trafficking. On March 16, 2011, Pease and another law enforcement officer, District Game Warden Mark Merrifield of the Maine Warden Service, had interviewed a different confidential source concerning drug dealing in the mid-coast region of Maine.[1] That source had reported that Luce had sold marijuana out of a store that he owned in Union and that, after he moved his store to Waldoboro, he continued selling marijuana there. The source gave no information regarding any possible supplier to Luce. Following that interview, Pease contacted other sources in the mid-coast area to keep their ears open regarding Luce and his store, The Shoebox, in Waldoboro.

The CI first contacted Pease with respect to Luce on June 2, 2011, reporting that Luce and Taylor were involved in a multi-pound marijuana distribution operation, with Taylor supplying Luce. Pease had the impression from this conversation, which was held face-to-face in the presence of another law enforcement officer, Detective Ronald Rollins, that the CI knew both Luce and Taylor personally, had spoken with them, and was providing first-hand information, although he did not have a close relationship with Luce.

Following that interview, Pease and other law enforcement officers began monitoring both Luce and Taylor. The CI next contacted Pease to advise him to keep his eyes open for a potential drug transaction on June 10, 2011. The CI reported that Taylor was going to obtain

---

[1] Although Merrifield is a game warden, he is also experienced in drug enforcement and covert operations and has assisted the MDEA in its drug enforcement investigations from time to time.

marijuana from a supplier in the Lewiston-Auburn area, and Taylor and Luce were planning to move 40 to 80 pounds of marijuana, although the CI could not provide an exact drop-off time. Officers set up surveillance but observed no drug transaction on that date.

On June 12, 2011, the CI again contacted Pease, reporting that Taylor and Luce were trying to arrange an eight-pound marijuana transaction that day. The CI said that Taylor and Luce were not having much luck with the supplier in Lewiston and expected to be able to obtain at most eight to 10 pounds of marijuana. Officers established surveillance of The Shoebox and of Taylor's mother's residence in a trailer park in Wiscasset, where Taylor kept a vehicle, but observed no transaction. Between June 10 and June 16, 2011, Pease was in regular contact with the CI, who kept him apprised as to why certain transactions did not occur.[2]

As of June 16, 2011, Pease was familiar with both Luce's and Taylor's appearance and the appearance of their vehicles. That day, Pease received several phone calls from the CI reporting a planned 20-pound marijuana deal by Luce and Taylor. The CI stated that, because Taylor's supplier had gone dry, the pair was planning to use an old supplier of Luce's. The CI told Pease that Luce and Taylor were traveling together, were going to be in the Wiscasset area, possibly at Taylor's mother's residence, and were trying to obtain some money. The CI had no information concerning the identity of Luce's supplier. Pease set up surveillance, first traveling to The Shoebox in Waldoboro and then to Taylor's mother's residence in Wiscasset. Pease observed a sign on the front door of The Shoebox indicating that there had been a family emergency and that someone would return at a later time.[3]

---

[2] On cross-examination, Pease testified that his confidence in the CI was not shaken by the non-occurrence of predicted drug transactions on June 10 and 12, 2011, because officers were receiving other information, about which he did not elaborate, that explained the non-occurrence. He added that officers never can be certain that a predicted drug transaction will occur.

[3] Pease could not remember whether the sign indicated that someone would return by 11:00 a.m. or 12:30 p.m. Nothing turns on that timing.

3

Pease then traveled to Taylor's mother's residence at the trailer park in Wiscasset, in front of which he observed a parked vehicle that he recognized as Taylor's red Toyota Corolla. Taylor came out of the residence, followed by Luce, and the two talked outside of the vehicle. Luce was holding a white plastic bag, inside of which Pease saw something that appeared to be a red chip bag. Pease observed the two men get into the Toyota and followed them north to a McDonald's in Damariscotta, where they ordered lunch, and then further north to a trailer park in Waldoboro where Luce resided. Luce entered his residence. Pease followed Taylor as he drove on alone to an Irving gas station on Route 1 in Waldoboro.

None of the conduct that Pease observed was consistent with the existence of a family emergency. However, nothing further of interest transpired until later that afternoon, when Pease received a call from the CI informing him that, between 5 and 6 p.m., Luce would be meeting with his old supplier to obtain approximately 20 pounds of marijuana and, between 6 and 6:30 p.m., Taylor would be meeting with Luce to obtain the marijuana. The CI did not say where the transaction between Luce and his old supplier was to take place.

Based on that information, Pease set up surveillance at Taylor's mother's residence in Wiscasset and arranged for other law enforcement officers to set up surveillance in Waldoboro and in Union, where Luce had a seasonal campsite at the Mic Mac Campground. Officers did not locate Luce at either his store or his residence. However, Merrifield, who was conducting surveillance at the Mic Mac Campground, spotted Luce's vehicle, a dark green Ford Explorer with a V-8 emblem and a bumper sticker advertising his business, The Shoebox, and relayed that information to Pease. Pease proceeded to Union. During that interval, Luce got in his car and drove away, followed by Merrifield and another officer. While Pease was on the Middle Road in Union, he observed Luce's vehicle in the parking lot of an elderly housing complex called Seven

4

Tree Manor. Pease drove past the complex and quickly turned around, but by the time he returned, Luce's vehicle was gone.

Pease drove to the intersection of Middle Road and Route 131, turned north on Route 131, and instructed Merrifield to head south on Route 131. Within less than two minutes, at approximately 5:45 p.m., Pease observed Luce's vehicle parked at a picnic area near a stream off of Route 131, with a pickup truck parked directly behind it. The lift gate of Luce's vehicle was open. As Pease drove by at a speed of about 35 miles per hour, he observed Luce and an unknown male, whom he now knows to be Maguire, standing outside of the vehicles. Luce was walking toward his vehicle with his arms extended, carrying a bulky package at least 18 inches to two feet wide, with the pickup truck to his back. Pease did not observe Luce actually place the package in the back of his vehicle and could not tell exactly what was in the package. Pease had never previously seen either Maguire or the pickup truck.

Pease drove about 200 yards past the picnic area and turned around in time to see Luce's vehicle turning north onto Route 131, and the pickup truck turning south. Pease radioed Merrifield, explained what he had just witnessed, gave Merrifield a description of the pickup truck, and instructed him to identify the driver, a task that necessarily would entail stopping the vehicle. Pease then followed Luce's vehicle to a convenience store at Mic Mac Campground, where Luce parked. Pease, whose vehicle is not equipped with blue lights or a siren, parked behind Luce and got out. As soon as Luce saw Pease, who was wearing a vest marked with the word "Sheriff," a police hat, and an MDEA badge, he broke into a run toward the woods in back of the camp store, even before Pease could finish identifying himself and ordering him to stop. Pease went to the back of the store but did not give chase, both because Luce had run some distance ahead of him and because he wanted to secure Luce's vehicle. As he approached the

5

vehicle, he could smell marijuana. He peered in from the outside and saw, out in the open, one large bale of a substance he recognized as marijuana, packaged in green shrink wrap, and another large bale of marijuana protruding from a duffel bag. The bales were of a size consistent with the package that Pease had observed Luce carrying.

While Pease kept guard over Luce's vehicle, he radioed other officers to request assistance in searching for Luce. He also dispatched two officers to assist Merrifield, Detective Lieutenant Reginald Walker of the Knox County Sheriff's Office and Detective Lance Mitchell of the Waldoboro Police Department and the MDEA.

While Pease was focused on Luce, Merrifield, who was dressed in full uniform, caught up to the pickup truck, activated his blue lights and sirens, and pulled it over. He observed no traffic infraction or vehicle defect. Instead, he pulled the pickup truck over solely on Pease's instructions. Merrifield ordered the driver, who was the sole occupant, to step out of the truck, walk to Merrifield's vehicle, and put his hands on the hood. The driver, later identified as Maguire, did so. Merrifield does not typically order drivers out of their vehicles when he conducts a traffic stop. He did so in this case for his safety. He believed, based on Pease's report, that the driver had just been involved in a drug transaction.

Merrifield patted Maguire down, finding nothing, and asked for his identification, which Maguire said was in his wallet in the truck. Maguire had his cell phone in his hand and was using his hands to gesture as he talked. Merrifield ordered him three or four times to keep his hands on the hood. He also directed him to place his cell phone on the hood. Maguire did so but then removed his hands from the hood, retrieved the cell phone, and started walking back toward his truck. He informed Merrifield that he was going to call 911 to find out if he was being pulled over for a valid reason. Merrifield then grabbed him by the arm, walked him back to the front of

his vehicle, took his cell phone, and placed him in handcuffs. He did so not only for his safety, given Maguire's refusal to obey voice commands, but also because he was concerned that Maguire had access to his cell phone and might use it to contact Luce, making it difficult for Pease, whose vehicle was not equipped with blue lights or a siren, to apprehend Luce. Merrifield kept his gun holstered during these interactions.

Just after Merrifield handcuffed Maguire, Walker, who was in plainclothes but may have had a visible firearm, arrived to assist Merrifield. Walker ascertained that Merrifield had not yet questioned Maguire. Walker asked Maguire if he had any weapons or contraband in his truck. Maguire admitted that he had marijuana roaches in his vehicle but explained that he had a medical marijuana prescription. Walker asked if he could retrieve the paperwork to confirm that, and Maguire agreed. Walker retrieved Maguire's wallet from the truck, detecting an odor of burning, stale marijuana as he did so. Walker then returned with the wallet, opened it, examined Maguire's marijuana prescription, and read Maguire his *Miranda* rights verbatim from a card issued by the Office of the Attorney General, using Maguire's identification from his wallet to call him by name.[4] Maguire stated that he understood each of his rights and agreed to answer questions. Neither Walker nor Merrifield observed any difficulty in Maguire's ability to communicate or to understand what was being communicated to him.[5]

---

[4] Pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 478-79.

[5] Maguire testified that he was read his *Miranda* rights and did understand them, but denied that he was ever asked if he wanted to talk to the officers. I find it more likely that he was so asked, in accordance with the *Miranda* rights card that Walker testified that he read verbatim to Maguire, which concludes with the question, "Now, having all those rights that I just explained to you in mind, do you wish to answer questions at this time?" Gov't Exh. 2. However, even if Maguire was not asked this specific question, it is apparent from his interactions with the officers that he was willing to cooperate and answer questions.

Walker then asked Maguire for permission to search his vehicle. Maguire said that he could, and Walker proceeded to conduct the search.[6] Walker found several marijuana roaches in different locations in the truck as well as a brown paper bag on the passenger side of the vehicle containing a Doritos chip bag, inside of which was a significant amount of money. He did not separately ask Maguire if he could search inside the brown paper bag. At no point did Maguire object to, protest, or place restrictions on Walker's search of the truck. Walker found Maguire to be pleasant and very cooperative.

Mitchell arrived on the scene as Walker was searching Maguire's pickup truck. He was driving an unmarked police car and had a holstered firearm in plain view. He confirmed with Walker that Maguire had been read his *Miranda* rights and had not indicated that he wished to remain silent or wanted an attorney present. Mitchell conversed with Maguire and found his demeanor pleasant and cooperative.

As Pease coordinated officers' efforts and guarded Luce's vehicle, he stayed in touch by radio with Merrifield, Walker, and Mitchell. Pease, for example, informed Merrifield after Walker's arrival that Luce had fled on foot from his vehicle, and Pease was notified that Walker had located a chip bag containing a large amount of cash and that Maguire had been read his *Miranda* rights, was cooperating, and had revealed some information about that day's marijuana transaction and expressed concerns about his suppliers.

After Walker completed his search of Maguire's vehicle, Pease requested that Mitchell transport Maguire to the Mic Mac Campground so that Pease could interview him, and Mitchell

---

[6] Maguire denied that Walker asked his consent to search his truck prior to conducting that search. However, he also testified that (i) he assisted the officers in opening the tonneau cover on the back of his truck so as to avoid any damage to that cover, (ii) when he gave Walker permission to look for his marijuana roaches and his wallet, he thought that he was giving him permission to search the truck, and (iii) he did not object to the search of the truck because he had nothing in it. It is clear that Maguire gave consent to the search of his truck.

8

did so. Merrifield followed in his own vehicle. When Pease initially spoke with Maguire, Maguire was sitting in the back seat of Mitchell's vehicle, wearing handcuffs. Pease recorded the first 16 minutes of his conversation with Maguire, which he described as the "investigative phase," during which he focused his questioning on Maguire's dealings with Luce. *See* Gov't Exh. 1, 1T. At the outset, Pease asked whether Maguire had been advised of his *Miranda* rights, and Maguire confirmed that he had been. *See id*. Maguire expressed great concern about the safety of himself and family members, although he was reluctant to make clear the identities of the people whom he feared. *See id*.

After 16 minutes, Pease moved into the "cooperation phase" of his interview with Maguire. At no point during the remainder of his dealings with Maguire that day did he tape any additional conversations. At the end of the "investigative phase" of the questioning, Maguire was permitted to step outside the vehicle, and his handcuffs were removed so that he could smoke a cigarette. Maguire proved very cooperative. He offered to bring law enforcement officers to a "stash house" in Portland, Maine, from which multiple pounds of marijuana had been sold. Pursuant to a quickly devised operations plan, Pease drove Maguire's truck to Portland with Maguire in the front passenger seat, unhandcuffed and free to smoke cigarettes, and Mitchell in the back seat. Maguire was fitted with a body wire. During the drive to Portland, Mitchell found Maguire to be friendly, personable, and polite.

In Portland, Maguire phoned a friend who was guarding the stash house and took Pease, who was posing as his friend, inside. Maguire and Pease obtained 40 pounds of prepackaged marijuana. Maguire then drove Pease and Mitchell in his truck to the Portland MDEA office, where officers took custody of the marijuana. Maguire was not charged or jailed at that time and was permitted to drive his truck home. In addition, in response to Maguire's professed safety

9

concerns involving people who were expecting either money or drugs from Maguire, Pease contacted a federal DEA agent about the possibility of maintaining surveillance on individuals in New York and Massachusetts.

At no time during the Portland operation did Maguire indicate an unwillingness to continue cooperating with Pease and Mitchell. At no time did Maguire ever tell Pease, while at the Mic Mac, *en route* to Portland, or in Portland, that he wished to have an attorney present. At no time on June 16, 2011, did Merrifield, Walker, or Mitchell ever hear Maguire ask for an attorney.[7]

## II. Discussion

Maguire raises two issues in his Motion: (i) that Merrifield lacked the requisite reasonable, articulable suspicion of criminal activity to stop Maguire's vehicle, and (ii) that any statements that Maguire made to officers after allegedly invoking his right to counsel must be suppressed. *See* Motion at 4-8. During oral argument, Maguire's counsel made two additional arguments: that (i) Merrifield effectuated Maguire's *de facto* arrest without probable cause, and (ii) Mitchell's search of the brown paper bag exceeded the scope of Maguire's consent to search.

---

[7] Maguire testified that after Walker found a Red Bull can with marijuana roaches in his truck, he told Merrifield that he wanted to have his lawyer present, which he believed was his right. He testified that Merrifield, who was watching the search, did not respond. He also testified that before Pease conducted the recorded interview with him, Pease removed him from Mitchell's vehicle, permitted him to smoke a cigarette, told him he wanted to get a few things out of the way off the record before he started recording, and threatened to arrest Maguire's fiancée (now his wife), his mother-in-law, and everyone else whom Maguire knew if Maguire did not cooperate. Maguire testified that he told Pease that he did not know what good it was going to do for Pease to question him because he had already asked for a lawyer and been ignored, and Pease responded that it did not matter because he (Pease) just wanted to ask a few questions about Luce. I find this testimony implausible. First, it contradicts the testimony of Pease, Walker, Mitchell, and Maguire himself that he was very cooperative with these officers. Second, it contradicts the testimony of Pease, Walker, Mitchell, and Merrifield that at no time on June 16, 2011, did any of them hear Maguire ask to have an attorney present. Third, it contradicts Maguire's own actions. Rather than remaining silent or insisting on the presence of an attorney when his requests for an attorney twice were allegedly ignored, he actively negotiated with officers, securing, in exchange for his cooperation, his release on June 16, 2011, and at least the possibility of some protection from feared reprisals by drug sources. Fourth and finally, Maguire's explanation for why he did not repeat his alleged demand for an attorney when he knew that Pease was recording their conversation is anemic: that he did not think about it.

The government bears the burden of proving the lawfulness of warrantless searches and seizures, *see, e.g., United States v. Ramos-Morales*, 981 F.2d 625, 628 (1st Cir. 1992), including traffic stops, *see, e.g., United States v. Gates*, Criminal No. 08-42-P-H, 2008 WL 5382285, at *7 (D. Me. Dec. 19, 2008) (rec. dec., *aff'd* Feb. 12, 2009), arrests, *see, e.g., United States v. Jenkins*, Criminal No. 10-85-P-H, 2010 WL 3463736, at *5 (D. Me. Aug. 27, 2010) (rec. dec., *aff'd* Oct. 18, 2010), and consensual searches, *see, e.g., United States v. Reynolds*, No. CR-07-86-B-W, 2009 WL 1090674, at *3 (D. Me. Apr. 21, 2009), *aff'd*, 646 F.3d 63 (1st Cir. 2011) ("In addition to the requirement that it be based on valid consent, a consensual search may not exceed the scope of the consent given. The Government must prove by a preponderance of the evidence that the consent given was valid and that the search did not exceed its scope.") (citations and internal punctuation omitted).

The government also bears the burden of proving compliance with the dictates of *Miranda*, *see, e.g., United States v. Barone*, 968 F.2d 1378, 1384 (1st Cir. 1992), which include the directive that, following a suspect's unambiguous invocation of the right to an attorney, police must cease questioning him or her until an attorney is present, *see, e.g., United States v. Olsen*, 609 F. Supp. 1154, 1158 (D. Me. 1985).

For the reasons that follow, I conclude, and recommend that the court find, that the government has met its burden with respect to each of Maguire's points.

### A. Lawfulness of Vehicle Stop

The First Circuit has observed:

> In *Terry v. Ohio,* [392 U.S. 1 (1968)], the Supreme Court first recognized that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest. This authority permits officers to stop and briefly detain a person for investigative purposes, and

11

> diligently pursue a means of investigation likely to confirm or dispel their suspicions quickly.

*United States v. Trueber,* 238 F.3d 79, 91-92 (1st Cir. 2001) (citations and internal punctuation omitted).

The validity of an investigative *Terry* stop hinges on "whether the officer's actions were justified at their inception, and if so, whether the actions undertaken by the officers following the stop were reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officers during the stop." *Id.* at 92 (citations and internal punctuation omitted). An "objective reasonableness standard" governs. *United States v. Moore*, 235 F.3d 700, 703 (1st Cir. 2000).

"The first part of the [*Terry*] inquiry is satisfied if the officers can point to specific and articulable facts which, taken together with rational inferences derived from those facts, reasonably show that an investigatory stop was warranted." *United States v. Maguire*, 359 F.3d 71, 76 (1st Cir. 2004). "To withstand scrutiny [in the context of a *Terry* stop], an officer must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *Id.* (citations and internal quotation marks omitted). "[T]he focus is upon the collective knowledge possessed by, and the aggregate information available to, all the officers involved in the investigation." *United States v. Capelton*, 350 F.3d 231, 240 (1st Cir. 2003) (citation and internal quotation marks omitted) (observing that knowledge of DEA agents who undertook investigation could be imputed to state police who actually effectuated *Terry* stop under "fellow officer rule").

Maguire contends that Merrifield lacked reasonable, articulable suspicion to stop his vehicle on June 16, 2011, because:

1. Officers relied on a CI whose information was of questionable reliability given that the CI had wrongly predicted that drug transactions involving Luce and Taylor would occur on June 10 and June 12, 2011, and was not a close associate of Luce;

2. Neither the CI nor any other source provided officers information concerning Maguire;

3. Pease did not observe any clearly unlawful behavior when he drove by the roadside picnic area where Maguire and Luce were parked. He did not know what was in Luce's hands. Further, Maguire and Luce were out in the open, rather than concealing themselves as might be expected were they engaged in illegal activity; and

4. Merrifield did not observe a traffic infraction or vehicle defect. Rather he pulled Maguire over based solely on Pease's directive.

Nonetheless, the government carries its burden of demonstrating that officers collectively had reasonable, articulable suspicion to stop Maguire's truck based on:

1. A tip regarding an imminent drug transaction from a CI who (i) was well-known to Pease, (ii) had previously provided reliable information leading to drug seizures and drug-related arrests, (iii) knew Luce and Taylor personally, and (iv) seemed to have first-hand knowledge regarding their plans; and

2. Corroboration, through surveillance, of activity consistent with that tip, including observations that (i) Luce and Taylor were together as predicted, engaging in activities inconsistent with the placement of a sign on the front door of The Shoebox indicating that there had been a family emergency, (ii) Luce's vehicle was parked in front of a pickup truck at a roadside picnic area at approximately 5:45 p.m., within the 5 to 6 p.m. time frame that the CI had stated that the drug transaction would occur, (iii) Luce was carrying a bulky package toward his

vehicle, which had its liftgate raised, and (iv) Luce and the then-unknown male were parked at the scenic spot for a matter of only minutes, which was inconsistent with recreational use.

As the government's counsel contended at oral argument, the fact that the CI provided information with respect to two potential drug transactions that did not occur did not undercut the CI's reliability. Pease testified that officers never can be certain that a predicted drug transaction will occur and, in any event, the CI and/or other sources had explained why those predicted transactions did not occur. In addition, in the totality of the circumstances, the facts that (i) Merrifield did not personally observe a traffic infraction or vehicle defect and pulled Maguire over on Pease's orders and (ii) officers had never heard of Maguire prior to June 16, 2011, did not undercut the existence of reasonable, articulable suspicion to detain him, based on officers' collective knowledge, at the moment that he was detained.

### B. Asserted *De Facto* Arrest

At oral argument, Maguire's counsel argued that Merrifield effectively placed his client under arrest when he ordered him out of his truck, directed him not to move his hands or use his cell phone, and handcuffed him, and that he lacked probable cause to effectuate his arrest at that time.

The government's counsel rejoined that (i) the use of handcuffs during a traffic stop is not necessarily tantamount to an arrest, (ii) Merrifield reasonably temporarily employed handcuffs for his own safety, given that he was at that time alone, had a reasonable basis to suspect that Maguire had just been involved in a drug transaction, and Maguire was being uncooperative and threatening to use his cell phone, posing a threat to the integrity of the Luce/Taylor investigation, and (iii) officers did develop probable cause to arrest Maguire after

Luce fled from Pease, Pease located two bales of marijuana in Luce's vehicle, and Walker found a substantial amount of cash in the brown paper bag in Maguire's truck.

The government has the better argument. The use of handcuffs to address legitimate officer safety concerns during a *Terry* stop or investigative detention does not transform that detention into an arrest. *See, e.g., United States v. Pontoo*, __ F.3d __, No. 10-2455, 2011 WL 6016141, at *8 (1st Cir. Dec. 5, 2011) ("[T]he limits of a *Terry* stop are not automatically transcended by an officer's use of other prophylactic measures. When officer safety is a legitimate concern, a *Terry* stop appropriately may involve the application of handcuffs[.]"); *United States v. Navarrete-Barron*, 192 F.3d 786, 791 (8th Cir. 1999) (in light of dangerous nature of suspected crime of drug trafficking and good possibility driver or passenger had weapon, limits of *Terry* stop were not exceeded when suspect was handcuffed while officers searched truck; "Several other circuits also have found that using handcuffs can be a reasonable precaution during a *Terry* stop."); *Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1030 (10th Cir. 1997) ("[A] *Terry* stop does not automatically elevate into an arrest where police officers use handcuffs on a suspect or place him on the ground. Police officers are authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of a *Terry* stop.") (citations and internal punctuation omitted); *United States v. Le*, 377 F. Supp.2d 245, 254 (D. Me. 2005), *aff'd*, 471 F.3d 1 (1st Cir. 2006) ("Of course, officers may take necessary steps to protect themselves if the circumstances reasonably warrant such measures without transforming a *Terry* stop into an arrest. This includes drawing weapons when reasonable, such as when officers are faced with a report of an armed threat. The First Circuit has also allowed the reasonable use of handcuffs and backup officers as the situation requires.") (citations and internal quotation marks omitted).

Merrifield was alone when he stopped Maguire. Based on the information that Pease had relayed, he reasonably suspected that Maguire had been involved in a drug transaction, an enterprise with a known connection to violence. *See, e.g., United States v. Bullock*, 510 F.3d 342, 346 (D.C. Cir. 2007) ("If an officer possesses reasonable suspicion that the detained suspect committed a violent or serious crime – such as murder, robbery, rape, burglary, assault with a weapon, or various drug offenses – the officer by definition is dealing with an individual reasonably suspected of committing a crime that involves or is associated with carrying or using a weapon. In such cases, it logically and necessarily follows that the officer may reasonably conclude the suspect may be armed and presently dangerous.") (citation and internal quotation marks omitted). Against that backdrop, Maguire was defying Merrifield's voice commands, walking back to his truck, and threatening to use his cell phone in circumstances in which his suspected drug dealing associate, Luce, remained at large.

In the circumstances, Merrifield's use of handcuffs during the remainder of the investigative detention did not amount to a *de facto* arrest. As argued by counsel for the government, the officers' investigations with respect to both Luce and Maguire quickly confirmed, rather than dispelled, their suspicions regarding Maguire, supplying probable cause for Maguire's arrest on marijuana trafficking charges. *See United States v. Winchenbach*, 197 F.3d 548, 555-56 (1st Cir. 1999) (an officer's determination that a crime has been committed need not be "ironclad" or even "highly probable"; it need only have been "reasonable" to satisfy the standard of probable cause).

### C. Asserted Search Exceeding Scope of Consent

Maguire's counsel also asserted, at oral argument, that the search of the brown paper bag found in Maguire's truck exceeded the scope of his client's consent. For that proposition, he

relied on the undisputed fact that Maguire never was asked for, and did not give, specific consent to search that item. Nonetheless, as counsel for the government suggested in rejoinder, specific consent was not required in these circumstances.

The First Circuit has observed:

> A search justified by consent will be deemed reasonable as long as it does not exceed the scope of the consent given. When determining the scope of consent, we apply a test of objective reasonableness: What would the typical reasonable person have understood by the exchange between the officer and the subject? This inquiry requires an examination of the overall context, including contemporaneous police statements and actions.

*United States v. Jones*, 523 F.3d 31, 38-39 (1st Cir. 2008) (citations and internal punctuation omitted).

I have recommended that the court find as facts that Maguire consented to the search of his vehicle, imposed no restrictions on that search, and at no time protested or objected to the ongoing search. I also conclude that a reasonable person in Maguire's shoes would have understood that Walker, who had asked Maguire whether he had any weapons or contraband in his vehicle, intended to search, at the least, for those things. On materially similar facts, the Supreme Court has held that officers reasonably construed a suspect's consent to search his car as encompassing a search of a paper bag found within it:

> The scope of a search is generally defined by its expressed object. In this case, the terms of the search's authorization were simple. Respondent granted Officer Trujillo permission to search his car, and did not place any explicit limitation on the scope of the search. Trujillo had informed respondent that he believed respondent was carrying narcotics, and that he would be looking for narcotics in the car. We think that it was objectively reasonable for the police to conclude that the general consent to search respondent's car included consent to search containers within that car which might bear drugs. A reasonable person may be expected to know that narcotics are generally carried in some form of a container. Contraband goods rarely are strewn across the trunk or floor of a car. The authorization to search in this case, therefore, extended beyond the surfaces of the car's interior to the paper bag lying on the car's floor.

*Florida v. Jimeno*, 500 U.S. 248, 251 (1991) (citations and internal quotation marks omitted). *See also, e.g., United States v. Forbes*, 181 F.3d 1, 7 (1st Cir. 1999) ("A general consent to search a motor vehicle subsumes the specific consent to search any easily accessible containers within the vehicle.") (citation and internal punctuation omitted).

The government, accordingly, meets its burden of demonstrating a lawful consent search of the paper bag.

### D. Alleged Invocation of Right to Attorney

"In *Edwards v. Arizona,* 451 U.S. 477 (1981), the Supreme Court held that law enforcement officers must immediately cease questioning of a suspect who clearly asserts his or her right to have counsel present during interrogation. *See Edwards*, 451 U.S. at 484-85. *See also, e.g.*, *United States v. Libby*, No. CRIM. 04-26-B-W, 2004 WL 1701042, at *6 (D. Me. July 30, 2004) (rec. dec., *aff'd* Sept. 27, 2004) ("If a defendant subjected to custodial interrogation unequivocally invokes his right to counsel, all questioning must cease. To activate the prohibition on continued questioning, however, the request for counsel must be unambiguous.") (citations omitted).

Maguire contends that, on June 16, 2011, he twice invoked his right to an attorney, once to Merrifield and once to Pease, but both ignored his invocation of that right. *See* Motion at 6-8. The government disputes that Maguire ever invoked his right to an attorney on that day. *See* Government's Objection to Defendant's Motion To Suppress (Docket No. 30) at [7]. I have recommended that the court find as a fact that Maguire never invoked his right to an attorney while in the presence of Merrifield, Walker, Mitchell, or Pease on June 16, 2011. That is dispositive of this basis for Maguire's motion to suppress.

18

### III. Conclusion

For the foregoing reasons, I recommend that Maguire's motion to suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 13th day of February, 2012.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge